| | |
|---|---|
| UNITED STATES OF AMERICA | CRIMINAL ACTION |
| VERSUS | NO: 12-202 |
| GIRAY BIYIKLIOGLU | SECTION: "A" (5) |

### ORDER AND REASONS

Before the Court is a **Motion to Vacate Pursuant to 28 U.S.C. § 2255** (**Rec. Doc. 201**)[1] filed by the Defendant Giray Biyiklioglu. The United States of America ("the Government") opposes the motion (**Rec. Doc. 211**). Having considered the *pro se* motion, the opposition, the record, and the applicable law, the Court finds that the Defendant's **Motion to Vacate Pursuant to 28 U.S.C. § 2255** (**Rec. Doc. 201**) is **DENIED** for the reasons set forth below.

**I.    Background**

On August 19, 2014, the Court sentenced Biyiklioglu to a total term of 192 months after a jury found him guilty of thirteen counts of wire fraud, six counts of aggravated identity theft, two counts of tax evasion, and nineteen counts of money laundering. (Rec. Doc. 139). This conviction stems "from a scheme in which Biyiklioglu transferred money online among his bank accounts and numerous fraudulent PayPal accounts and then disputed certain transactions so as to cause double payments to his bank accounts and corresponding losses to PayPal." *United States v. Biyiklioglu*, 652 Fed.Appx. 274, 278 (5th Cir. 2016).

---

[1] The Court notes that Biyiklioglu originally filed his Memorandum in Support of this motion in Rec. Doc. 199, but this submission was marked deficient. Biyiklioglu then subsequently refiled his motion. Rec. Doc. 201. However, when he refiled, he failed to attach his Memorandum in Support to Rec. Doc. 201. Thus, there is no memorandum in support of this motion before the Court. But, because the Government responded to Biyiklioglu's Memorandum in Support in its Opposition, the Court shall treat Biyiklioglu's Memorandum in Support filed in Rec. Doc. 199 as if it were properly refiled in Rec. Doc. 201.

Biyiklioglu then filed a Notice of Appeal on August 22, 2014, and the Fifth Circuit subsequently reversed Biyiklioglu's conviction with respect to counts 1, 3, 6, 7, 11, 14, 21, and 22 of the indictment but affirmed his conviction as to counts 2, 4, 5, 8–10, 12, 13, 15, 17–20, and 23-41. (Rec. Doc. 175, p. 25, Fifth Circuit's Judgment). The case was then remanded to this Court where he was re-sentenced to the same sentence of 192 months, (Rec. Doc. 190, p. 2, Amended Judgment), which the Fifth Circuit subsequently affirmed. *United States v. Biyiklioglu*, 716 F. App'x 270, 274 (5th Cir. 2017). Biyiklioglu now brings the instant *pro se* motion to vacate the sentence alleging ineffective assistance of counsel. (Rec. Doc. 201, Biyiklioglu's Motion to Vacate).

## II. Legal Standard

28 U.S.C. § 2255 "provides the federal prisoner with a post-conviction remedy to test the legality of his detention by filing a motion to vacate judgment and sentence in his trial court." *United States v. Grammas*, 376 F.3d 433, 436 (5th Cir. 2004) (quoting *Kuhn v. United States*, 432 F.2d 82, 83 (5th Cir. 1970)). The statute states that a prisoner in custody under a sentence of a federal court "may move the court which imposed the sentence to vacate, set aside or correct the sentence." *Id*. (quoting 28 U.S.C. § 2255). Where there has been a "denial or infringement of the constitutional rights of the prisoner as to render the judgment vulnerable to collateral attack, the court shall vacate and set the judgment aside and shall discharge the prisoner or resentence him or grant a new trial or correct the sentence as may appear appropriate." *Id.* However, "[r]elief under 28 U.S.C. § 2255 is [only] reserved for violations of constitutional rights and for a narrow range of injuries in federal criminal cases that could not have been raised on direct appeal and would result in a fundamental miscarriage of justice." *United States v. Petrus,* 44 F.3d 1004, 1012 (5th Cir. 1994).

Further, a district court may deny a § 2255 motion without conducting any type of evidentiary hearing if "the motion and the files and records of the case conclusively show that the prisoner is entitled to no relief." *United States v. Arguellas*, 78 Fed. Appx. 984, 986 (5th Cir. 2003) (quoting 28 U.S.C. § 2255; *United States v. Bartholomew,* 974 F.2d 39, 41 (5th Cir. 1992)). Conversely, if the record does not conclusively negate a prisoner's entitlement to relief, contested issues of fact may not be decided on affidavits alone. *Id*. (citing *Owens v. United States*, 551 F.2d 1053, 1054 (5th Cir. 1977)). Lastly, no hearing is necessary when the issues raised by the prisoner were previously decided on direct appeal, contain no constitutional violations, or lack any support in the record. *United States v. McCollom*, 664 F.2d 56, 59 (5th Cir. 1981) (citing *Buckelew v. United States*, 575 F.2d 515 (5th Cir. 1978)).

### III. Discussion

In his motion, Biyiklioglu argues that his sentence should be vacated because of the ineffective assistance of counsel he received at his trial. (Rec. Doc. 199, p. 1, Biyiklioglu's Memorandum in Support). In order to prevail on an ineffective assistance of counsel claim, the petitioner must satisfy the two-part test enunciated in *Strickland v. Washington,* 466 U.S. 668 (1984). First, the petitioner must establish that his counsel's performance fell below an objective standard of reasonableness, which is defined as "research[ing] relevant facts and law, or mak[ing] an informed decision that certain avenues will not be fruitful." *United States v. Grammas*, 376 F.3d 433, 436 (5th Cir. 2004) (quoting *United States v. Conley*, 349 F.3d 837, 841 (5th Cir. 2003)).

Second, the petitioner must then show that he was prejudiced by his counsel's substandard performance. *Grammas*, 376 F.3d at 436. "To prove prejudice, the defendant must show that there [was] a reasonable probability that, but for counsel's unprofessional errors, the result of the proceeding would have been different." *Id*. (quoting *Conley*, 349 F.3d at 841-42). The Fifth Circuit

"consider[s] such factors as the defendant's actual sentence, the potential minimum and maximum sentences that could have been received, the placement of the actual sentence within the range of potential sentences, and any relevant mitigating or aggravating circumstances." *United States v. Seglar*, 37 F.3d 1131, 1136 (5th Cir. 1994). Lastly, if a defendant makes an insufficient showing on either of the two *Strickland* prongs, the Court need not address the other. *Powell v. Owens*, 43 F.3d 670 (5th Cir. 1994) (citing *Strickland*, 466 U.S. at 697).

Here, Biyiklioglu argues that his counsel's assistance was ineffective because his counsel failed to: (1) conduct an investigation that would have revealed exculpatory invoices and emails; (2) depict the invisible and inaccessible nature of certain incriminating files on Biyiklioglu's laptop computer; (3) present particular PayPal phone recordings in their entirety, instead of just short snippets; and (4) object to his ex-wife's testimony about their marital communications. (Rec. Doc. 201, p. 4-8). The Court will now address each of Biyiklioglu's four contentions in order.

**A. Failure to Investigate Sales Invoices and Emails**

In his Memorandum in Support, Biyiklioglu states that he instructed his counsel to investigate a website named "iomtr.com" which he used as his "Internet Office."[2] (Rec. Doc. 199, p. 3). More specifically, he told his counsel that this website contained two important pieces of evidence: (1) invoices documenting his jewelry sales to his business partner, "Armen," which would match the amount of money disbursed by "Armen" through PayPal and (2) emails containing admissions by "Armen" describing how "Armen" perpetuated the PayPal scheme and deceived Biyiklioglu. *Id.* 3-4. After conducting a thorough review of the documents submitted by Biyiklioglu, the Court finds this new evidence unconvincing.

---

[2] "In 2012, Biyiklioglu registered 'iomtr.com' which is an acronym for 'Internet Ofisim Turkiye.' It translates in English [to] 'My Internet Office Turkey.'" (Rec. Doc. 199, p. 3, n.4).

First, as to the newly discovered invoices, the Court is not swayed by Biyiklioglu's contentions that he was prejudiced by his lawyer failing to discover and present these documents to the jury. This is because these invoices fail to cast doubt on the Government's theory that the PayPal scheme was perpetrated by Biyiklioglu, instead of by an unknown man named "Armen." For instance, these purported "invoices" describe every reported sale only by using the title "Gold and Diamond." (Rec. Doc. 201-9 to 201-27, Biyiklioglu's Invoices). Further, every sale documented on each of the "invoices" is listed as being made on the same day for even dollar amounts (i.e., $2,000). *Id*. Thus, these "invoices" fail to exonerate Biyiklioglu, and, in fact, make his claim that he worked as a legitimate jewelry salesman look even more suspicious.

Second, the Court is also unconvinced that the case would have proceeded differently if the jury would have viewed the newly discovered emails submitted by Biyiklioglu. (Rec. Doc. 201-28, Emails with "Armen"). Although the emails show the owner of the email account "armen_d@iomtr.com" admitting to perpetuating the PayPal scheme, the Court has no way of knowing who actually wrote these emails. (Rec. Doc. 199, p. 7, Biyiklioglu's Memorandum in Support). For example, Biyiklioglu could have created the "armen_d@iomtr.com" account in order to send these fictitious exculpatory emails to his personal account ("giraycam@iomtr.com") and further develop his fake "Armen" persona. This explanation seems particularly plausible based on the fact that Biyiklioglu owned the "iomtr.com" website which was the domain for both Biyiklioglu's email account (giraycam@iomtr.com) and Armen's supposed email account (armen_d@iomtr.com). *Id*. Thus, the Court finds it highly unlikely that "Armen," Biyiklioglu's alleged boss, would create and maintain an email address located at the same website that Biyiklioglu used as his personal "Internet Office." *Id*. at 3, n.4.[3]

---

[3] As an aside, the Court also notes that this line of reasoning can also be applied to the singular email seen in Exhibit 5 from "ditalia4@yahoo.com" which also purports to be from "Armen." (Rec. Doc. 199-7, Email

Further, as an aside, Biyiklioglu's newly-proffered invoice and email evidence also fail to explain how anyone other than Biyiklioglu could have linked his bank accounts to the fraudulent PayPal accounts. (Rec. Doc. 211, p. 9, The Government's Opposition). As PayPal's investigator explained at trial, "before PayPal would allow a customer to link a bank account, it would make two small deposits in random amounts to the bank account and then require the customer to recite the amounts as proof that this was truly the customer's bank account." *Id*. "Thus, in order to conduct the scheme, the perpetrator must have had ready access to deposit information of approximately 25 bank accounts held at five different institutions during the course of more than two years." *Id*. 9-10. Accordingly, Biyiklioglu has failed to show that anyone other than himself had access to the bank accounts that were linked to the fraudulent PayPal accounts. *Id*.; Rec. Doc. 132-6 at 48 (Biyiklioglu conceding that the bank accounts used in the scheme belonged to him).

For all of these reasons, Biyiklioglu has failed to show that there is a reasonable probability that the trial's result would have reached a different conclusion if his counsel would have investigated and presented the alleged newly discovered evidence.[4]

**B. Files on Biyiklioglu's Computer**

Next, Biyiklioglu argues that his trial counsel failed to illustrate the hidden and inaccessible nature of the incriminating files found on his computer. At the trial, a Secret Service agent testified that he used a "Forensic Toolkit Application" to search Biyiklioglu's laptop and uncovered a "Slack Space" file containing the PayPal information of one of the victims in the PayPal scheme.

---

from Armen D). Although this email was sent from someone after Biyiklioglu was placed into federal custody, there is no way a trier of fact could definitively know that "Armen" authored that email.

[4] The Court also notes that it does not need to address whether Biyiklioglu's lawyer fell below an objective standard of reasonableness by not presenting evidence of the invoices or the emails because: "[i]f a defendant makes an insufficient showing on either one of the two prongs of the *Strickland* test the court need not address the other." *Powell v. Owens*, 43 F.3d 670 (5th Cir. 1994).

(Rec. Doc. 199, p. 10, Biyiklioglu's Memorandum in Support). The agent then concluded that, because this file was found in the computer's "Slack Space," this meant that the file was either previously deleted or overwritten. *Id*. Thus, Biyiklioglu argues that: (1) by showing the jury screenshots of his computer's files, the Secret Service agent created the false impression that Biyiklioglu could access these files and (2) if his counsel would have examined his computer, his counsel could have shown that Biyiklioglu had no way of accessing these incriminating files.

Here, the Court finds Biyiklioglu's contentions unconvincing. At trial, the important issue was not whether Biyiklioglu could access these incriminating files. Rather, it was whether Biyiklioglu deleted these files as a way to cover his tracks. Thus, at trial the jury had the opportunity to consider both competing narratives: (1) Biyiklioglu's theory that someone else placed the files on his computer and deleted them before he personally was aware of them, (Rec. Doc. 132-6, p. 43, Biyiklioglu's Trial Testimony), or (2) the Government's theory that Biyiklioglu made these files invisible by deleting them. (Rec. Doc. 152, p. 10, The Government's Closing Argument). Accordingly, Biyiklioglu's contention here has no merit, and the Court finds that Biyiklioglu has failed to show that there is a reasonable probability that the trial would have reached a different conclusion if his counsel presented the hidden nature of the incriminating files.[5]

### C. Recorded Telephone Calls to PayPal

Next, Biyiklioglu argues that his trial counsel was ineffective by not letting the jury listen to the entirety of the PayPal recorded phone calls. More specifically, Biyiklioglu contends that "[w]hile [my trial lawyer] turned a blind eye to this critical evidence, the government used this

---

[5] The Court also notes that it does not need to address whether Biyiklioglu's lawyer fell below an objective standard of reasonableness by not presenting evidence of the accessibility of the files because: "[i]f a defendant makes an insufficient showing on either one of the two prongs of the *Strickland* test the court need not address the other." *Powell v. Owens*, 43 F.3d 670 (5th Cir. 1994).

evidence to its advantage by editing more than three minutes long [of] phone calls to twenty-seconds [of] audio clips to bolster the identity theft charges. (Rec. Doc. 199, p. 12, Biyiklioglu's Memorandum in Support). "The government simply played the twenty-seconds [of] audio clips and asked its witnesses whether the voice was theirs or not." *Id*. "Full recordings were never played." *Id*. Lastly, Biyiklioglu contends that he has newly discovered email evidence showing "Armen" identifying the unknown voice as his female assistant. *Id*. at 13.

The Court finds this line of reasoning unconvincing. Although the jury never heard the entire PayPal recordings, the jury still heard enough of them to determine that a female was speaking instead of a male. Accordingly, the jury still had the opportunity to determine if the female sounding voice belonged to Biyiklioglu, or someone else. (Rec. Doc. 128, p. 99-100, Testimony of PayPal Employee). Further, the Court also notes that Biyiklioglu's newly found email evidence, which depicts "Armen" confessing to instructing his female assistant to call PayPal, also fails to exculpate him in any meaningful way. Thus, the Court finds that Biyiklioglu has failed to show that there is a reasonable probability that the trial would have reached a different conclusion if the jury heard the full PayPal recordings.[6]

**D. Spousal Communications**

Lastly, Biyiklioglu argues that his trial counsel failed to assert the spousal communications privilege when his ex-wife, Rebecca, testified against him. More specifically, Biyiklioglu complains that his ex-wife should have been prevented from testifying about: (1) their communications between 2006 and 2010 concerning the preparation of their annual tax returns

---

[6] The Court also notes that it does not need to address whether Biyiklioglu's lawyer fell below an objective standard of reasonableness by not presenting the entire audio recordings because: "[i]f a defendant makes an insufficient showing on either one of the two prongs of the *Strickland* test the court need not address the other." *Powell v. Owens*, 43 F.3d 670 (5th Cir. 1994).

and (2) a specific email from 2010 where Biyiklioglu stated that he would send his ex-wife $300 through a particular PayPal account to pay for their divorce. (Rec. Doc. 129, p. 26-45, Rebecca Friesen's Testimony).

The marital privilege encompasses two distinct privileges. *United States v. Miller*, 588 F.3d 897, 904 (5th Cir. 2009). The first, called the testimonial privilege, permits a married witness to refuse to testify adversely against his or her spouse. *Trammel v. United States*, 445 U.S. 40, 53 (1980). The witness may neither be compelled to testify nor foreclosed from testifying. *Id*. The second, called the spousal communications privilege, bars one spouse from testifying as to the confidential marital communications between the spouses. *United States v. Ramirez*, 145 F.3d 345, 355 (5th Cir.1998). This case involves the latter privilege instead of the former.

As to the testimonial privilege, the Fifth Circuit has definitively stated that permanently separated spouses cannot utilize the marital privilege to prevent one former spouse from testifying against another former spouse. *See United States v. Cameron*, 556 F.2d 752, 756 (5th Cir. 1977). For example, the Fifth Circuit in *Cameron* found that a couple was permanently separated because there was: "a great disparity between the amount of time that the couple cohabited and the time that one or the other chose not to live together" and this was bolstered by the fact that one of the spouses had already entered into "a more permanent living arrangement with another partner than with his spouse." *Id*. Although the Fifth Circuit has only used the spouses' permanent separation to disallow the testimonial privilege, it has never addressed whether permanent separation can preclude a spouse from exercising the marital communications privilege. However, the Fifth Circuit has inferred in *United States v. Phillips* that it would likely extend the reasoning found in the testimonial privilege to the spousal communications privilege as well by saying:

> Because we reverse these convictions on the grounds stated above, we do not reach the merits of the appellants' argument that the district court erred in admitting a tape

> made by [the Defendant's] second wife[.] This tape contained an admission by [the Defendant]—deemed by the government as significant—that his 1995 employment was a fraud. On appeal, [the Defendant] argues that the tape should have been excluded from evidence based on the spousal communications privilege, and that the error in admitting it was not harmless. The district court admitted the tape on the grounds that the [the Defendant and his spouse], at the time the tape was made, were separated and in the process of becoming divorced, and that under these circumstances, the marital relationship had ended and [the Defendant] was not entitled to claim the spousal communication privilege. The record here, however, shows that there was no permanent irreconcilable separation at the time [the Defendant's second wife] made the tape; indeed, there was a reconciliation that lasted several months after the tape was made. The relationship, therefore, was not "moribund" or "as a social fact had expired." *United States v. Cameron*, 556 F.2d 752, 756 (5th Cir.1977). ***Although we have not clearly spoken on the impact of a marital separation on this privilege, it does seem that the better rule requires the district court to inquire into the nature of the separation before deciding whether to apply the privilege.*** *See, e.g., United States v. Roberson*, 859 F.2d 1376, 1381 (9th Cir.1988); *In re Grand Jury Witness*, 791 F.2d 234, 238–39 (2d Cir.1986).[7]

Thus, because the Court finds no compelling reason to distinguish the spousal communications privilege from the testimonial privilege in this instance, the Court chooses to extend the rule for permanently separated spouses outlined in *Cameron* by applying it to the spousal communications privilege at issue in this case. *See* 556 F.2d at 756

At trial, Biyiklioglu's ex-wife testified that they were married in 2005 but that they then quickly separated three months later when she moved out of their apartment. (Rec. Doc. 129, p. 25-26, Rebecca Friesen's Testimony). Further, once they separated, his ex-wife never intended on reconciling their relationship or living with him again. *Id*. at 40. This was demonstrated by the fact that Biyiklioglu reached out to her a year or two into their separation with the hopes of resuming their relationship, but she refused. *Id*. Although they maintained limited contact between 2006 and 2010 through phone and email, they ultimately obtained a divorce in early 2011. *Id*. at 35-36.

Here, under *Cameron*, the Court finds that the marriage between Biyiklioglu and his ex-wife was "moribund" and "as a social fact had expired" in late 2005 when Rebecca moved out of

---

[7] *United States v. Phillips*, 219 F.3d 404, 416 n.19 (5th Cir. 2000) (emphasis added).

their apartment with the intention of never resuming their marriage. *See Cameron*, 556 F.2d at 756. Because Biyiklioglu's ex-wife only testified about marital communications taking place between 2006 and 2010 after they permanently separated, the testimony of Biyiklioglu's ex-wife was admissible. Thus, the Court concludes that Biyiklioglu's counsel was not unreasonable in deciding not to object to his ex-wife's testimony. Further, as an aside, the Court notes that even if this testimony was improperly admitted, Biyiklioglu still failed to show how the exclusion of this evidence would have changed this trial's result.[8]

Lastly, because Biyiklioglu's § 2255 motion and the record in this case conclusively show that Biyiklioglu is not entitled to relief, the Court denies this § 2255 motion without the need of conducting an evidentiary hearing.

## IV. Conclusion

Accordingly;

IT IS ORDERED that the **Motion to Vacate Pursuant to 28 U.S.C. § 2255** (**Rec. Doc. 201**) filed by Defendant Giray Biyiklioglu is **DENIED**. Further, the Court denies Biyiklioglu's request to conduct an evidentiary hearing in connection with this motion.

November 14, 2019

JUDGE JAY C. ZAINEY
UNITED STATES DISTRICT JUDGE

---

[8] *See e.g., United States v. Winn*, 331 F. Supp. 3d 620, 630 (W.D. La. 2018) ("Even if this Court were to find that [the Defendant's spouse's] statement should not have been admitted, the error in admitting the statement would be harmless in this case. Unless there is a reasonable possibility that the improperly admitted evidence contributed to the conviction, reversal is not required.") (internal quotations omitted).